UNITED STATES of America, Appellant,

v.

Eliseo Sanchez RUEDA, Defendant-Appellee.

No. 591, Docket 76–1429.

United States Court of Appeals, Second Circuit.

Argued Jan. 4, 1977.

Decided Feb. 10, 1977.

---

Audrey Strauss, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., for the Southern District of New York, New York City), for appellant.

Jeffrey D. Ullman, New York City (Ivan S. Fisher, Edward M. Chikofsky, New York City, of counsel), for defendant-appellee.

Before MOORE, OAKES and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

The United States appeals from an order entered in the Southern District of New York, dated August 31, 1976, granting the motion of defendant Eliseo Sanchez Rueda to suppress evidence, namely, a matchbook, obtained in a search incident to his arrest. The court found that no probable cause existed for the arrest of Sanchez Rueda when he was apprehended in a New York hotel and charged with unlawful importation of narcotics. After considering the record, we disagree, and thus reverse the suppression order.

## I.

Eliseo Sanchez Rueda (hereinafter "Rueda") and Alphonzo Camargo were charged in Indictment 76 Cr. 625, filed July 6, 1976, with one count of conspiracy to import a narcotic controlled substance in violation of 21 U.S.C. §§ 846 and 963. Counsel for Rueda [1] entered a pre-trial motion to suppress all evidence obtained from his client at the time of his arrest. A suppression hearing was held from August 19–26, 1976, at which the Government brought out the following facts, primarily through the testimony of Special Agent Andres Amador of the United States Drug Enforcement Administration ("DEA").

On June 24, 1976, at the San Juan, Puerto Rico, International Airport, United States Customs officers arrested a Colombian woman named Ana Lupe Rodriguez, who was traveling under a passport issued to "Cynthia Maria McGlinn". Rodriguez had attempted to enter Puerto Rico with three kilograms of cocaine concealed beneath the false bottom of a a suitcase. She was removed to the Puerto Rican office of the DEA, where she was advised that she was in serious trouble, but that it would be to her advantage if she cooperated in identifying and apprehending her accomplices.

Rodriguez agreed to cooperate, explaining that the suitcase and false passport were given to her by her lover, Rueda. Pursuant to Rueda's instructions, she had traveled from Bolivia to Barranquilla, Colombia; then to Curacao; and finally to Puerto Rico. From there she was to fly to New York to deliver the suitcase to Rueda at the McAlpin Hotel; she would then continue her journey to Philadelphia. The

trip's procedures had been tested earlier in the year when Rodriguez went through a "dry run" with Rueda's "right-hand man", a septuagenarian nicknamed "El Viejito". Rodriguez also furnished the authorities with descriptions of both Rueda and the elderly man.

Continuing her cooperation the day following her arrest, Rodriguez traveled to New York with a DEA agent to make a "controlled delivery" of the suitcase and cocaine to Rueda. DEA agents set up surveillance at the McAlpin Hotel, renting a room adjacent to that rented by Rodriguez, and Rodriguez was equipped with two concealed recording devices: a Kel transmitter and a Nagra body tape recorder. Before meeting Rueda, Rodriguez told the DEA agents that she had telephoned her mother in Colombia, who told her that Rueda had called and had asked as to her whereabouts.

Rodriguez then proceeded to the hotel lobby, where she met a man fitting her description of Rueda. The pair briefly left the hotel in conversation, and on returning went to Rueda's room. The DEA agents monitored the pair's ensuing conversation.

Some of the recorded conversation was unintelligible, but much of it was audible and has been transcribed. (App. A–56 to A–76.) The transcripts reveal that Rueda was upset and angry at Rodriguez' one-day delay in arriving in New York, stating that he feared something had happened in Puerto Rico. Rodriguez belittled her delay, saying that she had simply missed a plane in Barranquilla, Colombia. Rueda spent an unusual length of time repeatedly pressing Rodriguez for details, obviously skeptical, once saying that he thought she was lying.

---

1. Rueda pleaded not guilty on July 5, 1976 at an arraignment upon the indictment. Motions to reduce his $50,000 cash or surety bond bail were denied on July 5 and July 14, 1976, but on August 3, 1976, Judge Duffy released him on his own recognizance. On August 19, 1976, Rueda's counsel conceded that he had become a fugitive in full awareness of the pending trial date.

The Government indicated that it would try him *in absentia*. Such a procedure was upheld for this circuit in *United States v. Tortora,* 464 F.2d 1202 (2d Cir.), *cert. denied,* 409 U.S. 1063,

93 S.Ct. 554, 34 L.Ed.2d 516 (1972). We held in that case that

"a defendant may waive his right to insist that his trial begin only in his presence. When a defendant has pleaded to the charges against him and knows that the trial of the charges is to begin on a day certain, the trial may start in his absence if he deliberately absents himself without some sound reason for remaining away." 464 F.2d at 1208. Rueda presented no defense at the proceeding at issue herein.

At one point in the conversation, Rueda mentioned "that crazy old man", and later Rodriguez similarly mentioned "the old man". More significantly, Rueda revealed that he had telephoned Rodriguez' mother in Colombia in an attempt to ascertain the reason for her delay.[2] It is clear throughout the conversation that Rueda was familiar with, and excessively concerned about, Rodriguez' travel arrangements.

The DEA agents disrupted the conversation by arresting Rueda when the couple was leaving his hotel room because, they testified later, they began to fear for Rodriguez' safety.[3] It is undisputed that the arrest occurred before any transfer of the cocaine to Rueda.

The agents informed Rueda of his rights and searched him. He claimed that his name was "Orozco", that he was merely "picking up" Rodriguez for a "good time", and that they had never previously met. In Rueda's pocket the agents found a matchbook marked "246 0700 Room 1110", the first seven digits of which correspond to the phone number of New York's Holland Hotel. Room 1110 was rented to Alphonzo Camargo, who had placed several phone calls to Colombia. On the basis of this information, the agents accompanied the elderly occupant of Room 1110 to headquarters for questioning. At headquarters, Ro-

driguez identified Camargo as "El Viejito", Rueda's associate, and he was placed under arrest.

At the conclusion of the suppression hearing, Judge Duffy granted all motions to suppress of defendants Rueda and Camargo. He found that there was no probable cause to arrest Rueda because the only incriminating facts related to him came from Rodriguez, whose reliability was previously untested; that the arrest occurred in the hotel hallway before any cocaine had been either discussed or transferred; and that the recording device transmissions offered no corroboration of Rodriguez' statements.[4] Without probable cause to validate the arrest of Rueda, the seizure of Rueda's matchbook and the subsequent arrest of Camargo were invalid.

The Government, pursuant to 18 U.S.C. § 3731, appeals the district court's finding that there was no probable cause to arrest Rueda, seeking reversal of the order suppressing the matchbook found incident to his arrest.

## II.

The primary issue in this case concerns whether or not the DEA agents who arrested Rueda could properly rely on the statements of Rodriguez in determining

---

**2.** "Rueda: Well then tell me what happened.
Rodriguez: No, no nothing happened, I lost

. . .

Rueda: Your mother told me something and I felt . . . like my head was splitting.
Rodriguez: It's just that she misunderstood me." (App. at 70.)

**3.** The district court expressed doubt about the credibility of this "fear". (App. 80.)

**4.** The district court's memorandum opinion reads as follows:

"No delivery was made of the cocaine from Ana Lupe Rodriguez to the defendant Sanchez Rueda.

"The arresting agent testified at the hearing that the sole factual basis for determining the probable cause to arrest Sanchez Rueda were statements by Ana Lupe Rodriguez. These statements by an individual whose reliability is totally unknown to the agents, who was caught with incriminating evidence, and whose statements tend to inculpate another

individual, can hardly be a sufficient basis for probable cause. (See *Wong Sun v. United States,* 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441] (1963) where the Supreme Court found an arrest to be illegal on facts similar to these.) Uncorroborated information from a person of unknown reliability is simply not a basis for probable cause.

"Certainly the Kel transmissions can offer no corroboration. First, it is clear that the government agents admitted that they did not monitor all of the transmission. Second, there is nothing on the tape of that transmission, which indicates that Rueda had any knowledge of the woman's involvement with illicit drugs.

"On all the evidence and particularly on the credibility of the various witnesses, I find that the arrest of Sanchez Rueda was made without probable cause." (App. 80–81.)

that there was probable cause for the arrest. Rodriguez was not a paid government informer, but Rueda argues that she should be treated as one. He asserts that she was an untested source of information, a person entirely unknown to the authorities prior to her arrest in Puerto Rico, and that her predicament after the discovery of the cocaine, including the offer of favorable treatment in return for the implication of others, could easily have encouraged her to fabricate Rueda's involvement in the conspiracy. He asserts that we must apply to this case the Supreme Court's test, set out in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), that an informant's trustworthiness must be demonstrated before there can be a finding of probable cause based upon information he supplies.

This argument ignores, however, those decisions rendered since *Spinelli,* in this circuit and others, which recognize that there is no need to show past reliability where the informant is in fact a participant in the very crime at issue. In *United States v. Miley,* 513 F.2d 1191 (2d Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975), we noted that a confessed participant in a crime is "no informant in the usual sense. . . ." 513 F.2d at 1204. In explaining the rationale for a rule that a criminal participant need *not* be shown to have been previously reliable before the authorities may rely on his statements, Judge Friendly observed for the court:

> "To require a showing of previous reliability by such a person would, as in the case of a victim or a witness . . . make his information totally unavailable, despite the peculiar likelihood of its accuracy." *Id.*

We again dealt with this issue, and reaffirmed the rule of the *Miley* case, in *United States v. Burke,* 517 F.2d 377 (2d Cir. 1975), where we pointed out the

> "growing recognition that the language in *Aguilar* and *Spinelli* was addressed to the particular problem of professional informers and should not be applied in a

wooden fashion to cases where the information comes from an alleged victim of or witness to a crime." 517 F.2d at 380.

Other cases in this circuit have likewise refused to require a demonstration of prior reliability where a paid informant was not involved. *United States v. Rodriguez,* 532 F.2d 834, 837 (2d Cir. 1976); *United States v. Rollins,* 522 F.2d 160, 164 (2d Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976).

Numerous decisions of other circuits have similarly limited the requirement of known reliability where the informant was a participant in, or witness to, the crime. *E. g., United States v. McCoy,* 478 F.2d 176, 179 (10th Cir.), *cert. denied,* 414 U.S. 828, 94 S.Ct. 53, 38 L.Ed.2d 62 (1973); *United States v. Unger,* 469 F.2d 1283, 1287 n.4 (7th Cir. 1972), *cert. denied,* 411 U.S. 920, 93 S.Ct. 1546, 36 L.Ed.2d 313 (1973); *United States v. Bell,* 457 F.2d 1231, 1238 (5th Cir. 1972); *United States v. Mahler,* 442 F.2d 1172, 1174–75 (9th Cir.), *cert. denied,* 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971); *McCreary v. Sigler,* 406 F.2d 1264, 1268–69 (8th Cir.), *cert. denied,* 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969).

Notwithstanding this formidable array of authority, Rueda asserts that a showing of Rodriguez' prior reliability should be required here because of her potential motive to incriminate another in order to ingratiate herself with the authorities. Yet the record fails to disclose any inherently overbearing tactics used by the DEA agents in questioning Rodriguez in Puerto Rico, either from the nature of the questioning or the environment in which it took place. The solicitation of Rodriguez' cooperation was no more coercive than the plea which arresting authorities surely give every arrestee involved in a potential conspiracy. And we doubt that Rodriguez would be led by such suggestions to implicate falsely her lover when she could as easily have implicated only "El Viejito".

Indeed, the statements of Rodriguez present a clear case for application of the *Miley* rule. She was a participant in the

crime as well as a witness to it. She made her statements to the DEA agents from personal knowledge of the events establishing Rueda's complicity. To require a showing of prior reliability would render unavailable the information which she was uniquely able to supply. The DEA agents here properly relied on her statements in helping to establish probable cause for Rueda's arrest.

■ We turn now to the determination of whether, with proper reliance on the statements of Rodriguez and other corroborative facts, the DEA agents had probable cause to arrest Rueda. Such a determination is often a question of fine judgments, and here the facts are particularly close. We are reminded of the oft-recited standard, applicable here, that "[p]robable cause to arrest exists when an officer has knowledge of facts and circumstances 'sufficient to warrant a prudent man in believing' that an offense is being or has been committed." *United States v. Edmonds,* 535 F.2d 714, 719 (2d Cir. 1976), *quoting from Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). We also note that it is established in this circuit that evidence sufficient to show probable cause by corroborating even a previously unknown informant may be found in circumstances which do not actually establish the crime itself.

"An untested informant's story may be corroborated by other facts that become known to the [arresting agent], even if they corroborate only innocent aspects of the story." *United States v. Sultan,* 463 F.2d 1066, 1069 (2d Cir. 1972).

In finding that probable cause had not been established, the district court relied on *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). But that case is clearly not applicable here. In *Wong Sun* the arresting agents acted on an arrestee's "tip" which included only a name, type of business, and street; no one by that name and business title existed, and the agents were given no street address number. Nonetheless, they arrested a man whose appearance had never been described

to them and whose name and business title only approximated those supplied in the "tip". The facts of this case disclose, in contrast, that these DEA agents were given an accurate description of Rueda, and several specific details given them occurred exactly as Rodriguez had recounted or predicted.

■ At the time of Rueda's arrest, more than sufficient data had already corroborated Rodriguez' account of his complicity to warrant a finding of probable cause. Rueda had met Rodriguez at the McAlpin Hotel exactly as she had predicted, and he fit the description she had previously given the agents. The ensuing conversation supported Rodriguez' statements in that the "old man" was explicitly mentioned. The unusual concentration of the taped conversation on the details of Rodriguez' travel arrangements, and Rueda's expression of doubt as to her alibi for her delay, also were in accord with her prior information. Significantly, in the taped conversation Rueda expressly corroborated Rodriguez' report that he had telephoned her mother in Colombia in an attempt to ascertain her whereabouts. These facts, which we note conform in every detail with what Rodriguez told the DEA agents, are in sum sufficient to corroborate her statements to the authorities.

Because probable cause existed for the arrest of Rueda, the suppression of the evidence seized incident to his arrest was improper. The order of the district court suppressing that evidence is reversed.