UNITED STATES of America, Appellee,

v.

Sally DI STEFANO and Linda Di Stefano, Appellants.

Nos. 994, 1085, Dockets 76–1581, 76–1582.

United States Court of Appeals, Second Circuit.

Argued April 27, 1977.

Decided May 16, 1977.

Irving Engel, Brooklyn, N.Y., for appellant Sally Di Stefano.

William J. Gallagher, New York City (The Legal Aid Society, Federal Defender Services Unit, David J. Gottlieb, New York City, of counsel), for appellant Linda Di Stefano.

Lee A. Adlerstein, Asst. U. S. Atty., Brooklyn, N.Y. (David G. Trager, U. S. Atty., E.D.N.Y., Bernard J. Fried, Asst. U. S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before MANSFIELD, Circuit Judge, SMITH, Chief Judge,* and PALMIERI, District Judge.**

PALMIERI, District Judge.

Sally Di Stefano ("Sally") and Linda Di Stefano ("Linda") appeal from judgments of the United States District Court for the Eastern District of New York, Platt, J., convicting them, after a jury trial, of bank robbery and conspiracy to rob a bank. 18 U.S.C. §§ 2113, 2, and 371. The indictment charged appellants Ronald Blanda,[1] and Patrick Edwards[2] with three crimes arising out of a robbery of the Chemical Bank in Holtsville, New York on May 28, 1976. Counts I and II charged the defendants

* Of the United States District Court for the District of Montana, sitting by designation.

** Of the United States District Court for the Southern District of New York, sitting by designation.

1. Co-Defendant Ronald Blanda was killed at the Metropolitan Correctional Center in New York City on July 23, 1976, on the eve of trial.

2. Patrick Edwards pleaded guilty to the bank robbery count and testified for the Government. He was sentenced on December 10, 1976 to an indeterminate period of incarceration not to exceed 10 years, pursuant to 18 U.S.C. § 4253.

with bank robbery and bank robbery with use of a dangerous weapon, respectively. Count III charged them with conspiracy. Sally was found guilty on all three Counts; Linda was found guilty on Counts I and III, and not guilty on Count II.

Prior to trial, Sally moved to suppress a bank bag and $223 in currency seized by FBI agents and Suffolk County police officers at the time of her arrest on June 2, 1976. The Court conducted a suppression hearing at which a Suffolk County police officer and an FBI agent testified. This testimony established that Patrick Edwards and Ronald Blanda were arrested at approximately 9:00 a.m. on June 2, 1976 and taken to the Suffolk County Police Station for questioning. After being advised of his rights, Edwards was interviewed by an FBI agent and a detective. Edwards stated that he had been involved in the bank robbery and that the Di Stefano sisters had participated. He stated that Sally had driven the car used by the robbers and that Linda had "cased" the bank prior to the robbery. The information provided by Edwards was partially corroborated by other information the agents had at that time. Specifically, they knew that a female had been seen driving the car used by the robbers and that the Di Stefano sisters and Ronald Blanda were friends.

Based on this information, the agents and officers proceeded to Sally's house in Centereach. They knocked on the door and were admitted either by Sally or her child. Sally was placed under arrest. She was wearing a nightgown and bathrobe at the time, and the agents requested that Sally retire into her bedroom to get dressed. Officer Roseanne Christie accompanied Sally into the bedroom. Sally opened the door to a closet which was approximately three feet from Officer Christie. On the floor of the closet on top of various other articles, Officer Christie observed what appeared to be a bank money bag. Because of the design of the room and the location of the closet,

Officer Christie could not view Sally's movements or the closet without entering the bedroom. The bank money bag was later seized by the Suffolk County police after they were advised of its presence by Officer Christie.[3]

While she was getting dressed, Sally removed from a pocket in her robe a quantity of currency wrapped in a rubber band. Sally handed this money to Officer Christie, stating "This is mine and I want this back." She also stated that this was money to be used for food stamps.

At the time of Sally's arrest and the seizure of these items, the officers did not have an arrest or search warrant. Based on the testimony at the suppression hearing, the district court denied the suppression motion.

The evidence adduced at the trial, viewed in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Mariani,* 539 F.2d 915 (2d Cir. 1976), established that Edwards had known Sally for many years and that, through her, he had become acquainted with her sister, Linda. He was also a friend of Ronald Blanda, with whom he traveled daily to and from a methadone treatment clinic. Approximately four months before the robbery, Blanda and Edwards began discussing the idea of robbing a bank. Blanda suggested that a particular branch of the Chemical Bank in Holtsville, where he was a customer, seemed to be a good bank to rob. Blanda took Edwards to look this bank over approximately a month before the robbery in order to determine whether there were any guards or bank surveillance cameras, how many tellers there were, and how much money the bank took in. At about this time Edwards sawed off part of the barrel of a shotgun he owned in order to make it easier to conceal.

About two days before the robbery, Blanda showed Edwards a newspaper clipping describing a bank robbery which Blanda

---

**3.** The head teller of the bank testified that this type of bag was the same type used by the bank for bagging coins.

claimed he had committed and from which he stated he obtained $2,000. On the morning of May 28, 1976, when Edwards awoke, he discovered that Blanda was sitting in the parlor of his house in Ronkonkoma. During their ride to the methadone treatment clinic, the two men decided to rob the Chemical Bank that day. They discussed the robbery further on their trip back to Edwards' house from the treatment clinic. When they returned to Edwards' house, they collected the sawed-off shotgun and some clothing and placed them in a bag. One of them telephoned Sally in order to obtain a car. While waiting for the car to arrive, Edwards and Blanda decided that they should make a final check of the bank before the robbery in order to determine if there was a guard or if the counters had been moved.

Shortly thereafter, Linda and Mary Lou Morra, a maid employed by Sally, met Edwards and Blanda in a car. Morra was driving the car. Edwards or Blanda told her to stop at the bank so that Linda could get change. Edwards testified that the purpose of this stop was to allow Linda to check the bank for guards and camera locations. This purpose, however, was not discussed in the car because Edwards and Blanda did not want Morra to know of the bank robbery. Edwards testified that he did not know how he or Blanda communicated to Linda that she was to inspect the bank for guards and cameras. When they

stopped at the bank, Blanda or Edwards gave Linda a dollar and sent her into the bank for change. When Linda returned, she nodded her head which Edwards testified was an indication to him that "everything was the same, there was no guard and the cameras were in the same position."[4] Nothing was said in this regard by Blanda, Edwards or Linda. After a brief stop at Blanda's house, the four proceeded to Sally's residence at which time Linda and Morra departed.

Sally assisted Edwards and Blanda with their disguises by providing them with stockings for masks and a big floppy hat. Sally telephoned a friend named Boyle to ask if she could borrow his car. After the car was delivered, Sally drove Edwards and Blanda to a parking lot at Suffolk Community College where they changed the license plates on the car and then proceeded to the bank. Edwards and Blanda committed the robbery while Sally waited in the car. Edwards entered the bank first and ordered everyone present to get down. He was wearing the big floppy hat and carrying the shotgun concealed under a jacket. Blanda then entered with a stocking covering his face and vaulted the counter. After collecting approximately $4,700 in coins and currency, Blanda jumped back over the counter, and the two men ran to the car. As they fled from the bank, Blanda was driving and Sally was crouched between the two men in the front seat.

---

**4.** The transcript of Edwards' testimony reads as follows:

A Yes. We told her, more or less, to stop and get some change and sent Linda into the bank to see if the bank had a camera or a guard there.

Q Was anything said in the car concerning the interior of the bank with reference to the camera or the guard?

A I don't know if there was anything said in the car. I really don't remember exactly how it went because we didn't want to let the driver know so we cut some shade on it and when we got to the bank Linda got out, one of us gave her a dollar to get some change with, and said to see if the guard was there.

. . .

The Court: What did you tell her?

The Witness: To go and get some change. We told the maid to pull into the bank so if

we're going to get some change they wouldn't think we were casing the bank. Linda went to the bank with the money to get the change, came out and indicated everything was the same, there was no guard and the cameras were in the same position.

The Court: Wait a minute. How did Linda know to come back and tell you when all you did was give her a dollar to get some change?

The Witness: I don't know exactly how we told her to do it. I don't remember. I'm trying to remember. I can't.

The Court: Any way, when she came out, what did she tell you?

The Witness: She didn't tell us. She indicated it to us that everything was the same.

The Court: By sign language?

The Witness: A nod or something like that, yes.

Blanda drove to the Suffolk Community College parking lot where he and Edwards removed the license plates. They then drove to Sally's brother's house, which was nearby, where Blanda and Edwards removed their outer clothing. Sally then drove the others to Blanda's mother's house where she left them to return the car to Boyle. Blanda and Edwards hid the shotgun in the basement and divided up the money obtained from the bank. Blanda and Edwards each took $2,000, leaving the "singles" and two-dollar bills (approximately $700) for Sally. No money was set aside for Linda. Sally subsequently returned to the house by taxi cab.

That evening, Sally, Blanda, Edwards, and a friend of Edwards drove to Manhattan and purchased cocaine. Although Edwards testified that he did not give Sally her $700 share of the proceeds of the robbery and did not see Blanda do so, Edwards did testify that he saw Sally hand Blanda a "stack of singles" that evening for the purchase of the cocaine.

Edwards' testimony with respect to the details of the robbery was corroborated by the testimony of other witnesses. In addition, two customers at the bank testified that they observed the car used by the robbers and their descriptions of it matched the description of Boyle's car. Boyle testified that Sally had borrowed his car on the day of the robbery. The license plates on the car used by the robbers, which were observed by witnesses at the bank, matched those which had been stolen in February 1976 from a car parked next door to Sally's house.

Linda was arrested on June 2, 1976 when she arrived at Sally's house while Sally was being taken into custody by the police. Officer Christie testified that at the time of Linda's arrest Sally was "quite emotional", screaming obscenities and trying to kick one of the officers. Officer Christie testified that Linda tried to calm her sister down. Linda was then taken to the Suffolk County Police Department, advised of her rights, and interviewed by FBI agent Sweeney. Sweeney testified that Linda stated to him that she had spent most of the day of May 28, 1976 at her parents' home in Centereach; that she had been to the Chemical Bank in Holtsville occasionally; that she was positive that she had not been in the bank on May 28; that she could not recall any time at which she was together with Blanda, Edwards, and Sally; that she was positive that the four of them had not been together on May 28; and that to the best of her knowledge neither she nor Sally had ever borrowed a car from Boyle. Agent Sweeney made handwritten notes of his interview with Linda which he used in dictating his narrative report of the interview. When he received the typewritten report, Sweeney compared it with his notes, and, being satisfied that the report was correct, destroyed the notes "as normal procedure".

Although neither defendant testified in her own behalf, Sally called two witnesses. The first, a next-door neighbor, testified that she saw Sally being carried out of her house on the day of the arrest. She testified that the police "dropped her [Sally] on the stoop because she was screaming" and dragged her to the police car. The second defense witness, an employee of the Suffolk County Department of Social Services, testified that Department records showed that Sally received $200 per month in public support payments which would normally arrive at her residence in the mail at approximately the first day of the month. Linda called no witnesses.

### The Admission of the Bank Money Bag and Currency

Sally first claims that the district court erred in admitting in evidence the bank money bag and currency seized from her at the time of her arrest. Although not delineated as such, Sally bases her argument on five separate grounds: (1) the officers lacked sufficient probable cause to arrest her because the source of the information known to the officers at the time of the arrest, Edwards, had not been shown to be reliable or trustworthy; (2) the officers did not properly announce themselves before

entering Sally's house; (3) the warrantless entry was not justified by "exigent circumstances"; (4) the seizure of the bank money bag was the product of a search which was not properly incident to an arrest; and (5) Officer Christie was not justified in being present in Sally's bedroom where she observed the bank money bag.

 The Government asserts that only the fifth ground was raised by defense counsel at the suppression hearing and that, therefore, the other grounds were waived below and cannot be asserted now. See *United States v. Rollins*, 522 F.2d 160, 165 (2d Cir. 1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976). The transcript of the suppression hearing shows that defense counsel did raise, at least indirectly, something more than the argument that Officer Christie was improperly in the bedroom. Defense counsel stated initially that there was no search warrant and he contested that the allegation that the bag was found in an open closet was "enough to make a search". During the examination of the FBI agent called by the Government, both sides fully inquired into the basis of the arrest, thus exploring the issue of probable cause extensively. Under the circumstances, this court finds that Sally did not waive her objections to the admission of this evidence based on grounds (1) and (4), *supra*.[5]

 There is no merit to any of the three contentions Sally did raise at the suppression hearing. First, she argues that the information known to the officers at the time of the arrest was insufficient to constitute probable cause because it came from a source whose reliability and trustworthiness had not been demonstrated in the past. This argument is untenable in light of this court's holdings in *United States v. Miley*, 513 F.2d 1191 (2d Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975) and *United States v. Rueda*, 549 F.2d 865 (2d Cir. 1977). Although it is well-established that an informant's trustworthiness must be demonstrated before there can be a finding of probable cause based on information he supplies, *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), this Circuit and others have held that there is no need to show past reliability where the informant is in fact a participant in or witness to the very crime at issue. *E.g., United States v. Miley, supra; United States v. McCoy*, 478 F.2d 176, 179 (10th Cir.), *cert. denied*, 414 U.S. 828, 94 S.Ct. 53, 38 L.Ed.2d 62 (1973); *United States v. Bell*, 457 F.2d 1231, 1238 (5th Cir. 1972); *United States v. Mahler*, 442 F.2d 1172, 1174–75 (9th Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971).

 The facts presented here are comparable to those presented in *United States v. Rueda, supra*. In both cases Government agents received information from a participant in the crime, based on that individual's personal knowledge of events establishing the defendant's complicity. If a prior showing of reliability were required of a

---

**5.** Grounds (2) and (3) were waived below because they were not raised in any manner at the suppression hearing. Even if they had not been waived, however, they are without merit. The agents were permitted to enter the house by Sally or one of her children. No guns were drawn and there was no use of force. *Compare Miller v. United States*, 357 U.S. 301, 313, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). Since the agents in entering did not "break open" the door, they were not required to give notice of their authority and purpose under 18 U.S.C. § 3109. *United States v. Salgado*, 347 F.2d 216 (2d Cir.), *cert. denied*, 382 U.S. 870, 86 S.Ct. 146, 15 L.Ed.2d 109 (1965). While the requirement of prior notice of authority and purpose should not be given "grudging application", *Miller v. United States, supra*, 357 U.S. at 313,

78 S.Ct. 1190, the statute is only directed to cases involving some use of force, *Sabbath v. United States*, 391 U.S. 585, 589, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1967). With respect to ground (3), the agents had probable cause to arrest Sally and statutory authority to do so, 18 U.S.C. § 3052, independent of any showing of "exigent circumstances." *Cf. United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (Substantially identical statutory authority of Postal Service officers to make warrantless arrests); *United States v. Price*, 345 F.2d 256 (2d Cir.), *cert. denied*, 382 U.S. 949, 86 S.Ct. 404, 15 L.Ed.2d 357 (1965) (Treasury agents).

participant in a crime, the information which that person is uniquely able to supply would be unavailable to Government agents. The agents here properly relied on Edwards' statements as tending to establish probable cause to arrest Sally. Moreover, as in *Rueda*, the information supplied by the participant in the crime was corroborated in part by other information known to the agents at the time of the arrest. The agents knew from witnesses to the robbery that a female had been seen driving the car used by the robbers. They also knew that Blanda, whom they had arrested and believed was a participant in the robbery, was a friend of the Di Stefano sisters. Although there is less corroborating evidence here than was present in *Rueda*, it is sufficient along with Edwards' statements to the agents to constitute probable cause.

■ Sally next contends that the seizure of the bank money bag was improper because it was the product of a search which was not incident to an arrest. The evidence adduced at the suppression hearing, however, clearly establishes that there was no search of the bedroom by Officer Christie. The money bag was in Officer Christie's plain view when Sally opened the door to the closet. It is well-established that "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968).

■ Finally, Sally argues that Officer Christie was not justified in being present in Sally's bedroom where she observed the bank money bag. Based on the testimony at the suppression hearing, the district court found that it was necessary for Officer Christie to stand right alongside Sally in order to maintain complete control of the situation. The court found that the officer would not have been in complete control if she had stood at the doorway of the bedroom. These findings are fully supported by the evidence and proper.

■ The officers had a duty to find clothing for Sally to wear or to permit her to do so. *United States v. Titus*, 445 F.2d 577 (2d Cir.), *cert. denied*, 404 U.S. 957, 92 S.Ct. 323, 30 L.Ed.2d 274 (1971). Having permitted Sally to retire to her bedroom to dress, Officer Christie was clearly justified in accompanying her to maintain a "watchful eye" on her and to assure that she did not destroy evidence or procure a weapon. *Cf. United States v. Montiell*, 526 F.2d 1008, 1010 (2d Cir. 1975). Since the evidence shows that the officer's entry into the bedroom was solely for the purpose of maintaining control over Sally while she dressed, it is clear that the discovery of the money bag in plain view was "inadvertent". *Coolidge v. New Hampshire*, 403 U.S. 443, 465–66, n. 24, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

*Sally's Identification by a Bank Witness*

Sally contends that the testimony of the bank's drive-in window teller that Sally "looks like [she] might be" the girl who drove the robbers' car was improperly received in evidence because it was tainted by an out-of-court confrontation between the witness and Sally. Sally further asserts that the identification was incompetent evidence because the witness had neither the opportunity nor the ability to view the car used in the robbery. These arguments are not supported by the record and are rejected.

■ The witness saw Sally sitting in a hallway of the courthouse when the witness was being escorted to the witness room by FBI agent Sweeney. The trial judge denied Sally's application for a hearing on the hallway confrontation prior to the witness's testifying on the ground that the confrontation was purely accidental. The court did, however, through its own questions to the witness, bring to the attention of the jury the fact that this witness had seen Sally in the hallway of the courthouse that morning, thus enabling the jury to consider what effect, if any, that out-of-court confrontation had on the witness's ability to identify Sally. Moreover, after the witness had testified, the court did conduct a hearing on

the confrontation. At that hearing, Agent Sweeney testified that he was unaware of Sally's presence in the hallway when he brought the witness through it and that he only became aware of her presence when the witness pointed it out to him. The record also establishes that this incident occurred at approximately fifteen minutes after the time the court had directed all attorneys and clients to be present in the courtroom. Under the circumstances, the trial court handled the matter properly. Since there was no showing that the incident was arranged by the Government or that the in-court identification was the result of an impermissively suggestive confrontation, the identification testimony was properly admitted. See *United States v. Gentile*, 530 F.2d 461, 468 (2d Cir.), *cert. denied*, 425 U.S. 903, 96 S.Ct. 1493, 47 L.Ed.2d 753 (1976).

 Sally's argument with respect to the competence of the identification testimony is likewise without merit. Although the witness was near-sighted, not wearing her glasses, and only saw the defendant for a brief period of time, this alone does not render her incompetent to testify to a partial identification. Sally's argument is addressed to the weight, rather than the admissibility of the testimony. Sally had ample opportunity to cross-examine the witness with respect to her ability to make the identification. The weight to be accorded this partial identification was properly for the jury.

### The Adequacy of Sally's Representation by Counsel

 Sally argues that she was inadequately represented by counsel based on several assertions contained in a letter which she wrote to the trial judge after the trial. Each of these assertions is clearly contradicted by the record, and it would serve no useful purpose to address them individually. The trial judge stated at a hearing prior to sentencing that her attor-

ney was "a very competent lawyer". The record bears this statement out, and accordingly, Sally's argument that her representation was inadequate cannot be accepted.

### Sally's Additional Claims

Finally, Sally raises several arguments on her own behalf which are set forth "without comment by her appellate counsel". These issues involve (1) the court's consideration of the pre-sentence report; (2) the court's charge that the jury could convict on circumstantial evidence; (3) the death of co-defendant Ronald Blanda on the eve of trial; (4) the disparity between the sentence she received and that which her sister received; and (5) Sally's allegation that she was "severely abused and bruised at the time of her arrest".

 None of these contentions has merit. The trial court considered Sally's objections to the pre-sentence report and conducted a hearing at which Sally and other witnesses for her and for the Government testified. The court's charge on circumstantial evidence was entirely proper. Sally's assertion concerning Blanda's death raises matters which are not part of the record on appeal, and this court will not consider them.[6] Sally's objection to the disparity between her sentence and that of her sister is not a matter which this court will generally review. It is sufficient to note for appellate purposes that Sally's sentence was well within the limitations set forth in the statute, *United States v. Seijo*, 537 F.2d 694, 700 (2d Cir. 1976), and that the disparity between her sentence and Linda's is fully justified by the evidence of their respective involvement in the robbery. Finally, Sally's assertion that she was mishandled at the time of her arrest appears to be an afterthought. It was not raised at the suppression hearing, where it might have been relevant, and will not be considered at this time.

---

**6.** We are advised that the FBI investigated the circumstances of Mr. Blanda's death and concluded that he died in an altercation with an-

other prisoner and that his death was entirely unrelated to this case.

*The Sufficiency of the Evidence Against Linda*

 Linda argues that the evidence was insufficient as a matter of law to sustain her convictions for conspiracy and aiding and abetting a bank robbery. We agree. Even viewing the evidence in the light most favorable to the Government, this court finds that the evidence failed to establish that there was a knowing agreement to rob a bank, of which Linda was a part, or that Linda consciously assisted the commission of the specific crime in an active way.

The only evidence which connected Linda to the bank robbery was Edwards' testimony that he and Blanda sent Linda into the bank to see if a guard was present and if the bank cameras had been moved.[7] Edwards testified that they did not discuss in the car what he claims was the true purpose of Linda's trip into the bank because of the presence of the maid. Under questioning by the court, Edwards testified that he did not know or could not remember how he and Blanda told Linda what to do in the bank. In addition, Edwards testified that on her return from the bank, Linda indicated by "a nod or something like that" that there was no guard and that the cameras were in the same position as before.

 This testimony is insufficient to establish that Linda knew that Blanda and Edwards intended to rob the bank and that she participated knowingly in the commission of that crime. Although willful participation in a criminal enterprise may be established by evidence which is completely circumstantial, *United States v. Manfredi*, 488 F.2d 588 (2d Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974), there must be some evidentiary basis for inferring that the defendant knew about the enterprise and intended to participate in it or to make it succeed. *United States v. Cirillo*, 499 F.2d 872, 883 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42

L.Ed.2d 653 (1974). The facts adduced at trial do not show that Linda knew about the bank robbery. Although Edwards testified that he and Blanda sent Linda into the bank on the day of the robbery to see if the bank had a guard or cameras, there was no evidence with respect to when or how he directed her to do so. His testimony shows that he and Blanda decided to commit the robbery only on the morning of May 28, and there was no evidence that he or Blanda ever informed Linda of this decision, either on May 28 or at any time before it. His testimony, in fact, shows that they deliberately did not discuss the robbery with Linda during their ride to the bank because of the presence of Morra in the car. Moreover, although Edwards testified that Linda "indicated" by "a nod" to him that there was no guard in the bank and that the cameras were positioned as they had been before, this testimony is insufficient to establish that she knew a bank robbery was to be committed or joined in a concert of purpose with the other defendants to rob the bank. *Cf. United States v. Peoni*, 100 F.2d 401, 403 (2d Cir. 1938).[8] Under the circumstances, the evidence is insufficient to support the inference that Linda knew that a bank robbery was planned and intended to participate in it by "casing" the bank. *United States v. Cirillo, supra.*

 For the same reasons, the aiding and abetting conviction cannot be sustained. This court in *United States v. Mariani*, 539 F.2d 915 (2d Cir. 1976), reaffirmed the well-established rule that in order to be convicted of aiding and abetting a "defendant must be shown to have knowingly associated with and participated in the criminal venture in a manner designed to accomplish its goal." *Id.*, at 919. In the absence of evidence that Linda knew that a bank robbery was planned, it cannot be said that she knowingly participated in the criminal venture. The evidence establishes only that she associated with guilty parties, was

---

7. The Government also introduced false exculpatory statements made by Linda after her arrest. These statements are considered *infra*.

8. There is no evidence that Linda was aware of the plan to rob the bank discussed by Edwards and Blanda prior to May 28, 1976 or of their decision on the morning of May 28, 1976 to commit the robbery that day.

present at the scene of the crime a few hours before the crime was committed, and entered the bank to change a dollar bill, perhaps with some awareness that some illegal venture was contemplated by her companions. (*e. g.*, passing a forged check). *United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977). These facts alone are insufficient to sustain her conviction for aiding and abetting. See *United States v. Johnson*, 513 F.2d 819 (2d Cir. 1975); *Bailey v. United States*, 135 U.S.App.D.C. 95, 416 F.2d 1110 (1969).

### The Trial Court's Instruction on Linda's False Exculpatory Statement

██ In its charge to the jury, the trial court instructed:

Evidence has been introduced that the defendant in this case, Linda Di Stefano, made certain exculpatory statements or claimed statements outside of this courtroom, explaining her actions.

If the jury finds such statements were untrue and the defendant made them with knowledge of their falsity, *the jury may consider them as circumstantial evidence of the defendant's guilt.* (emphasis supplied)

It is clear that this charge was incorrect. False exculpatory statements are not admissible as evidence of guilt, but rather as evidence of consciousness of guilt. *United States v. Johnson, supra*, at 824; *United States v. Parness*, 503 F.2d 430, 438 (2d Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). The Government contends that the omission of the word "consciousness" does not constitute reversible error where, as here, defense counsel failed to object to that portion of the charge. *United States v. Montalvo*, 271 F.2d 922 (2d Cir. 1959), *cert. denied*, 361 U.S. 961, 80 S.Ct. 589, 4 L.Ed.2d 543 (1960). We disagree.

██ Although defense counsel did not object to the charge as required by Rule 30, Fed.R.Crim.P. and thus must demonstrate "plain error", *United States v. Pelose*, 538 F.2d 41 (2d Cir. 1976), under the particular facts of this case we find sufficient error in the charge to warrant reversal. In *United States v. Johnson, supra*, this court stated that

falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt. 513 F.2d at 824.

*See also United States v. Kearse*, 444 F.2d 62 (2d Cir. 1971) where this court reversed defendant's conviction based on the insufficiency of the evidence notwithstanding false statements by the defendant on the witness stand intended to extricate himself from suspicious circumstances.

In *Johnson*, the court's charge on false exculpatory statements was a correct one. Where, as here, the charge is incorrect and prejudicial to the defendant,[9] there is an even more persuasive basis for reversal. Accordingly, we hold that under the facts of this case, where the evidence of guilt is weak, it was plain error for the district court to have given an incorrect charge on Linda's false exculpatory statements.

---

**9.** The incorrect charge improperly stressed for the jury the importance of Linda's false exculpatory statements. The significance of these statements in the context of this insufficient evidentiary case is obvious and was clear to the trial judge. In denying Linda's motion for a judgment of acquittal, the court stated:

I have been wrestling in my own mind for the last 24 hours, up to Agent Sweeney's testimony [concerning the false exculpatory statements], but in light of Agent Sweeney's testimony, I must deny it.

The Assistant United States Attorney in his summation stressed the importance of Linda's statements, arguing

. . . why would Linda Di Stefano have told an untruth about these facts unless she knew she was part of the plan and she knew that she was guilty of what the FBI was charging her with?

In view of the emphasis laid upon these statements, it was incumbent on the trial judge to instruct the jury properly as to how they could consider them.

*The FBI Agent's Destruction of His Notes*

■ After her arrest Linda was interviewed by FBI agent Sweeney, who made handwritten notes of her statements. Sweeney used these notes to compile his 302 Report of Interview, and then destroyed them as normal procedure. Linda asserts [10] that the destruction of these notes of her interview requires reversal of her conviction. Although two Circuits have suggested that sanctions might be imposed, *United States v. Harris*, 543 F.2d 1247 (9th Cir. 1976); *United States v. Harrison*, 173 U.S. App.D.C. 260, 524 F.2d 421 (1975); *Contra United States v. Harris*, 542 F.2d 1283 (7th Cir. 1976); *United States v. Pacheco*, 489 F.2d 554 (5th Cir. 1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975),[11] we need not reach this issue here because of our disposition of the other issues raised by Linda.

The judgments of conviction are affirmed as to Sally Di Stefano and reversed as to Linda Di Stefano.

**10.** In Point V of her brief, Sally stated that she "adopts and urges each point raised" by Linda "which is not inconsistent with the position taken" by Sally. The court will not consider the issue of the destruction of the notes, however, since it is entirely irrelevant to the issues raised by Sally. With respect to the sufficiency of the evidence against Sally, the recitation of the facts, *supra*, clearly demonstrates that the proof was sufficient to sustain her convictions.

**11.** This Court has recently adhered to the view expressed in *United States v. Terrell*, 474 F.2d 872, 877 (2d Cir. 1973) that

. . . the Jencks Act, 18 U.S.C. § 3500, imposes no duty on the part of law enforcement officers to retain rough notes when their contents are incorporated into official records and they destroy the notes in good faith. [citations omitted]

*United States v. Anzalone and Vivelo*, 555 F.2d 317 (2d Cir. 1977). The Court further held that it could not find that these notes constituted *Brady* material unless there was more of a showing that, notwithstanding the existence of the typewritten report which was furnished to the defendants, the handwritten interview notes would have been helpful to the defense.