Filed 6/9/15  P. v. Gosal CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE, | C074473 |
| Plaintiff and Respondent, | C075458 |
| v. | (Super. Ct. No. 08F07142) |
| GURPREET SINGH GOSAL, | |
| Defendant and Appellant. | |

Based upon defendant Gurpreet Singh Gosal's involvement in a shooting at a Sikh festival being held in Sacramento, he was convicted by a jury of the second degree murder of Parmjit Poma Singh (Poma) with a finding that he used a firearm in the killing, but was acquitted of the attempted murder of Sahibjeet Singh.  Defendant was sentenced to 35 years to life in prison.

On appeal, defendant contends the trial court prejudicially erred by instructing the jury per CALCRIM No. 3472 (one may not invoke self-defense if he or she provoked a fight or quarrel as an excuse to use force) because the evidence was insufficient to support the instruction.  Defendant also contends that the court prejudicially erred in instructing the jury per CALCRIM No. 371 (consciousness of guilt from defendant's

1

attempt to hide evidence) and CALCRIM No. 372 (consciousness of guilt from defendant's fleeing the crime scene) because each instruction "embod[ies] irrational permissive inferences in violation of due process." Lastly, defendant contends that if the foregoing errors were not singularly prejudicial, their cumulative effect was so. We reject the contentions.

## STATEMENT OF THE FACTS

On the weekend of August 30 and 31, 2008, a festival was held at the Bradshaw Sikh Temple in Sacramento, which was attended by several hundred people. The festival provided for games of field hockey, basketball, track and field, and cricket in nearby areas.

Defendant testified that in 2004 he lived in Elk Grove, which is where he became friends with Amandeep Dhami (Dhami). In 2006 defendant moved to Indiana. While in Indiana, defendant received threatening telephone calls from one Lahdi in California because defendant had refused to help Lahdi's friends in a criminal matter. Defendant stayed in touch with Dhami and was aware that Dhami was having problems with Poma, who knew Lahdi. Defendant learned that there was to be a meeting between Dhami and Poma on Saturday, August 30. Thinking this would be a good opportunity talk things over, defendant flew to Sacramento on that Saturday with a scheduled return flight for the following day around noon.

Dhami and his friend Navi picked up defendant at the airport Saturday evening and, after making a few short stops, they drove to the Gun Room, where Navi was to buy ammunition. However, because Navi did not have identification defendant bought the ammunition, which consisted of a large quantity of bullets of various calibers. The meeting with Poma did not take place so defendant went to a motel room with Dhami and others where they hung out.

The next day, defendant's ride to the airport failed to show and he missed his scheduled flight. Dhami eventually picked defendant up and the two decided to go to the

2

festival. Defendant put his duffle bag in the passenger seat of Dhami's sport utility vehicle (SUV) and saw a black backpack behind the seat. The two drove to the festival, parked, and walked to a drink stand. Defendant denied that either he or Dhami took anything out of the SUV and he denied having a gun or seeing Dhami with one. About 20 or 30 minutes later, while Dhami and defendant were walking to talk to some men, someone yelled Dhami's nickname and 15 to 20 men, among whom was Alvinder Khangura (Alvinder), were looking at them. Defendant recognized some of the men as the ones giving Dhami trouble.

As the men walked toward Dhami and defendant, Dhami said to Alvinder, "[W]hat's up bro?" Alvinder replied, "[N]o, bro," and punched Dhami in the face, and the men continued to advance toward defendant and Dhami. Dhami pulled a gun and the men with Alvinder backed up a few steps. A man in a white shirt pulled a gun, Alvinder hit Dhami again, the men started toward Dhami. Defendant heard three or four shots and the men started hitting Dhami and defendant. Someone struck defendant on the back of his head, causing him to stumble into Dhami who then handed defendant a second gun. Defendant tried to persuade the men not to fight, but they continued to beat him. Defendant backed up, fired about three shots into the ground, and then ran for the parking lot. As he ran, he threw away the gun and the keys to the SUV. Defendant was caught and beaten some more after which he was taken back to the festival area where he was held and later arrested.

The prosecution's evidence regarding the shooting was considerably different than defendant's version. Tajinder Uppal testified that he was at the festival on Sunday, about 1:00 p.m., and was returning to his truck to stow his gear after having played field hockey when he saw defendant drive into the parking lot in Dhami's SUV. Defendant and Dhami got out of the SUV, opened both rear passenger doors, and appeared to get something from the vehicle. As defendant and Dhami walked toward the fields, Uppal

3

did not see anything in their hands. Uppal started walking toward the temple when he heard gunshots and saw people chasing defendant.

Manwinder Singh Mavi (Mavi) testified that he was at the festival with his friends Sahibjeet Singh, Alvinder, and Poma watching a cricket match when he saw defendant and Dhami come through the main entrance and walk toward them. When defendant and Dhami were about 10 feet from Mavi's group, Dhami angrily and loudly cursed Poma and Poma's sister. Neither Poma nor anyone else argued back. Mavi saw Dhami and defendant each pull out a gun and start shooting in the direction of Mavi's group. Dhami fired several shots, ran out of ammunition, and tried to pull out another gun. After Dhami and defendant ran out of ammunition they ran but were caught by some of the men. Dhami was able to get into a car and escape. Defendant was caught, beaten, and then held for the arrival of law enforcement. Poma was fatally shot and died at the scene, and Sahibjeet Singh was seriously wounded.

Law enforcement agents searched the festival area. Beneath a Camry in the parking lot they found a .44-caliber revolver and a black backpack. The backpack contained five boxes of various calibers of ammunition, each of which bore a price sticker indicating it was purchased from the Gun Room. The revolver was loaded with .41-caliber bullets whose head stamps matched the head stamps of a box of .41-caliber head stamps found in the backpack.

### DISCUSSION

### I

The defense was self-defense, defendant admitting he fired several shots into the ground, but only after he and Dhami were being assaulted with clubs and hockey sticks. The trial court instructed the jury on self-defense and with CALCRIM No. 3472, which provides: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." Defendant contends there was insufficient evidence to support the instruction. We disagree.

4

" ' "[I]n criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) " 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. [Citation.]' [Citation.]" (*People v. Saddler* (1979) 24 Cal.3d 671, 681.) The facts supporting an instruction do not need to be conclusively established before the instruction can be given; instead, " 'there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference. [Citations.]' " (*People v. Alexander* (2010) 49 Cal.4th 846, 921.) Stated another way, "[W]e do not consider the credibility of a witness's testimony in determining whether the record holds substantial evidence to warrant a particular jury instruction." (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1419.)

Evidence supporting the instruction is as follows. Defendant flew to Sacramento purportedly to take advantage of an opportunity for him and Dhami to talk over their respective problems with Poma and Lahdi; however, shortly after Dhami and Navi picked defendant up at the airport they went to the Gun Room where defendant purchased a large amount of ammunition of varying calibers, an act hardly consistent with talking things over. The next day, defendant put his duffle bag in Dhami's SUV, saw a black backpack behind the passenger seat, and they drove to the festival.

Defendant and Dhami were seen pulling into the parking lot in Dhami's SUV, getting out, and appeared to be taking something out and then walking toward the fields. Shortly thereafter, gunshots were heard and people were running from the area toward which defendant and Dhami had been walking. After the shooting, the backpack and a

5

loaded gun were found under a car in the parking lot, the gun and backpack contained ammunition purchased from the Gun Room.

Mavi testified he was with Poma and other friends watching a cricket match when he saw Dhami and defendant enter the area, walk to within 10 to 12 feet of Mavi and Poma. Instead of trying to talk things over with Poma, Dhami started cursing at Poma and Poma's sister. Dhami then and asked Poma, "[N]ow where do you want to go," meaning what are you going to do about it. When neither Poma nor anyone else in Mavi's group responded or argued back, Dhami and defendant each pulled out a gun, which meant the guns were hidden on them, and began shooting toward Mavi and his group.

From this evidence, the jury could reasonably infer defendant and Dhami had gone to the festival with the intention of shooting Poma. Instead of immediately shooting Poma, with guns hidden, Dhami insulted and challenged Poma, suggesting that Dhami and defendant were trying to get Poma and/or the group he was with to initiate an assault upon them. This, in turn, would afford Dhami and defendant the benefit of claiming self-defense. Accordingly, there was sufficient evidence to support the CALCRIM No. 3472 instruction.

Defendant sees the circumstances of the present case as indistinguishable in its circumstances from those in *People v. Conkling* (1896) 111 Cal. 616 (*Conkling*). Defendant is wrong.

In *Conkling*, the victim put up a fence to stop neighborhood residents from crossing his land on their way to the post office. When the defendant attempted to cross the victim's land, the defendant was confronted by the victim who, after a heated argument, would not permit the defendant to continue. Days later the defendant armed himself with a rifle and, in the victim's absence, tore down the fence. Yet a few days later, the defendant, again armed with the rifle, was returning from the post office across the victim's land when the victim confronted him. Trouble arose between the two and

6

the defendant fatally shot the victim. Other than the defendant, there were no witnesses to the shooting. (*Conkling, supra,* 111 Cal. at pp. 619-621)

The defendant was charged with murder and claimed self-defense. Part of the trial court's instructions to the jury on self-defense stated the jury could infer that if, prior to the shooting, the defendant provoked a quarrel or was the cause of a danger he had brought upon himself, such conduct would forfeit his right to a claim self-defense. (*Conkling, supra*, 111 Cal. at pp. 624-625.) The Supreme Court found the instruction was reversible error because there was no evidence to show defendant initiated a quarrel or had brought danger upon himself; accordingly, there was no evidence to support the instruction. (*Id.* at pp. 625-626, 628.)

Defendant argues the present case comes within the scope of *Conkling* because "[t]he prosecution presented no direct evidence that [he] and [Dhami] went to the festival to provoke a fight with the intent to create an excuse to use force," and there was only circumstantial evidence that Dhami intended to provoke a fight, or that defendant knew of the weapons in Dhami's backpack. What defendant fails to grasp is that the facts giving rise to the giving of an instruction need not be conclusively established, but instead, " 'there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference.' [Citations.]" (*People v. Alexander, supra,* 49 Cal.4th at p. 921.) Indeed, Mavi's testimony that when none of his group responded to Dhami's verbal assault upon and challenge to Poma, Dhami and defendant pulled out guns and started shooting, constitutes evidence that Dhami and defendant were the initial aggressors. Accordingly, *Conkling* is factually distinguishable.

Counsel argues that *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*) states that CALCRIM No. 3472 is not a correct statement of the law. *Ramirez* is inapposite because it dealt with whether or not it was applicable to the circumstances of that case.

7

As given to the jury, CALCRIM No. 371 stated: "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." CALCRIM No. 372 stated: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Defendant argues these instructions violated his right to due process because they "permitted the jury to infer one fact, guilt, from other facts, i.e., alleged false evidence and flight." The instructions do no such thing.

"As the United States Supreme Court has observed: '. . . A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. [Citation.]' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 180.) And an "inference of consciousness of guilt from . . . fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction." (*People v. Holloway* (2004) 33 Cal.4th 96, 142.)

Each instruction informs the jury that if they find the predicate conduct then such conduct "may show that he was aware of his guilt." But each instruction further states that such a finding "cannot prove guilt by itself," thereby prohibiting the jury from basing a finding of guilt on defendant's hiding evidence or his fleeing the scene. Consequently, the instructions do not have the effect attributed to them by defendant.

Defendant further argues that "[t]he language of CALCRIM No. 371 is akin to that found constitutionally invalid in *United States v. Di Stefano* (2d Cir. 1977) 555 F.2d 1094." To the contrary, CALCRIM No. 371 conforms to the instruction approved by the

8

appellate court in *Di Stefano*.  In *Di Stefano*, the trial court instructed the jury:

" 'Evidence has been introduced that the defendant in this case, Linda Di Stefano, made certain exculpatory statements or claimed statements outside of this courtroom, explaining her actions.  [¶]  If the jury finds such statements were untrue and the defendant made them with knowledge of their falsity, the jury may consider them as circumstantial evidence of the defendant's guilt.' "  (*United States v. Di Stefano, supra,* 555 F.2d at p. 1104 (*Di Stefano*), italics omitted.)

In finding the instruction "incorrect," *Di Stefano* stated:  "It is clear that this was incorrect.  False exculpatory statements are not admissible as evidence of guilt, but rather as evidence of consciousness of guilt."  (*Di Stefano, supra,* 555 F.2d at p. 1104.)  We do not see CALCRIM No. 371 as "akin" to the challenged instruction in *Di Stefano*.

CALCRIM No. 372 does not suffer from the purported defect in the instruction as seen by the court in *Di Stefano,* to wit, that the evidence of knowing false statements are not admissible "as evidence of guilt" but are only admissible "as evidence of consciousness of guilt."  CALCRIM No. 372 states that the act of fleeing "may show that he was aware of his guilt."  In *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154 (*Hernandez Rios*), the court compared " 'awareness of guilt' " with " 'consciousness of guilt' " and determined they were essentially the same statement of a defendant's state of mind.  (*Id.* at pp. 1158-1159.)[1]  Because CALCRIM No. 372 states the evidence of flight

---

[1] *Hernandez Rios, supra*, 151 Cal.App.4th at pages 1158 through 1159, reasoned as follows:  "Our short etymological analysis of Rios's argument begins with a dictionary definition of the word 'aware':  'Having knowledge or cognizance.'  (American Heritage Dict. (4th ed. 2000) p. 125.)  In reliance on the dictionary's list of synonyms that include the word 'aware,' Rios argues that word 'implies knowledge gained through one's own perceptions or by means of information.'  (Italics omitted; see *ibid.*)  'Conscious,' another word on the list, 'emphasizes the recognition of something sensed or felt' (*id.*, at p. 125, italics omitted), which, of course, focuses on the acquisition of knowledge not by 'information' but by 'perceptions.'  (*Ibid.*)  Since the dictionary defines 'consciousness' as '[s]pecial awareness or sensitivity:  class consciousness; race consciousness' (*id.* at

9

may show "awareness of guilt," which is the same as "consciousness of guilt," which was approved by the *Di Stefano* court, defendant has no reason to complain.**2**

### III

Defendant contends that if we find that no single error by the trial court is sufficient to establish prejudice, the combination of the errors does so.  We have found that there was no error as argued, so there could be no combination of errors.  We have also noted that even if there was error its effect was utterly minimal given the overwhelming evidence of defendant's guilt.

### DISPOSITION

The judgment is affirmed.


     BLEASE     , Acting P. J.


We concur:


     MURRAY     , J.


     RENNER     , J.

---

p. 391, italics omitted), ipso facto the special awareness that [*People v.*] *Mendoza* [(2000) 24 Cal.4th 130] allows a jury to infer from a flight instruction is 'guilt consciousness (in the syntax of the dictionary) or 'consciousness of guilt' (in the syntax of the California Supreme Court).  (Compare American Heritage Dict., *supra*, at p. 391 (italics omitted) with *Mendoza, supra,* 24 Cal.4th at p. 180.)  As the inference in *Mendoza* passes constitutional muster, so does the inference here."

**2** Given our resolution of issues raised, we need not address the People's claim that defendant has forfeited challenges to the instructions.

10