UNITED STATES of America, Appellee,

v.

Calvin MACKLIN, Jr. and Arthur Garfield Swain, Defendants–Appellants.

Nos. 593, 594, Dockets 89–1245, 89–1246.

United States Court of Appeals,
Second Circuit.

Argued Feb. 23, 1990.

Decided March 14, 1991.

David Gerald Jay, Buffalo, N.Y., for defendant-appellant Calvin Macklin, Jr.

David A. Lewis (The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for defendant-appellant Arthur Garfield Swain.

Susan M. Barbour, Asst. U.S. Atty. (Dennis C. Vacco, U.S. Atty., Paul J. Campana, Asst. U.S. Atty., W.D.N.Y., Buffalo, N.Y., of counsel), for appellee.

Before LUMBARD, MINER, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Defendants-appellants Calvin Macklin, Jr. ("Macklin") and Arthur Garfield Swain ("Swain") appeal from judgments of conviction entered in the United States District Court for the Western District of New York, Richard J. Arcara, *Judge*, after a jury convicted them of conspiring to manufacture a substance containing phencyclidine ("PCP")[1] in violation of 21 U.S.C. § 846 (1988). Macklin contends on appeal that the indictment provided him with inadequate notice of the charge against him. Swain challenges the sufficiency of the evidence against him. He also asserts that at a sentencing hearing, the burden of proof as to the object of an uncompleted conspiracy should be higher than a preponderance of the evidence. Both claim that the trial court made clearly erroneous findings, in connection with sentencing, as to the quantity of pure PCP that Macklin and Swain could have produced from the chemicals found in their possession.

For the reasons that follow, we affirm the judgments of conviction.

## Background

During the evening of April 20, 1988, Macklin travelled from Buffalo, New York to New York City with Robert Yanders and Yanders' girlfriend, Betty Kendrick, in Kendrick's van. A week earlier, Macklin had asked Yanders to join him on the trip. Kendrick accompanied them because she wished to see New York.

Yanders drove the van, receiving directions along the way from Macklin. The three arrived in New York the morning of April 21. They stopped for breakfast, then went to a hotel where Yanders and Kendrick checked into a room. Macklin gave Kendrick the money to pay for the room, but remained behind in the van.

Some time later, while Yanders and Kendrick were watching television in the room, Macklin entered. Eventually, Macklin and Yanders returned to the van and drove away. Once again, Yanders was at the wheel, following Macklin's directions. After driving for fifteen to thirty minutes, they arrived in the vicinity of a collision shop, where Macklin told Yanders to park. Macklin got out, and Yanders waited in the van. Macklin returned with a man not known to Yanders. Each was carrying a white box, and they loaded the boxes in the back of the van. Macklin got back into the van, and he and Yanders returned to the hotel.

At the hotel, Macklin gave Yanders $80.00 for the trip back to Buffalo, then left in a cab. At an earlier point, however, Macklin had given Yanders a phone number, accompanied by the names "Shirley" and "Fats," and instructed Yanders to call that number upon returning to Buffalo. Some time later, Yanders and Kendrick checked out of the hotel and began their journey back to Buffalo. During the trip, Yanders noticed a heavy industrial smell

---

1. In street parlance, PCP is known as "angel dust."

inside the van; the smell, he later testified, was "[k]ind of like Lackawanna." Although the weather was cool, he kept the windows open.

At approximately 1:00 a.m. on April 22, Yanders and Kendrick reached the Williamsville toll area on the New York State Thruway near Buffalo. There, agents of the Drug Enforcement Administration ("DEA") and police officers, who had information which caused them to be on the lookout for the van, stopped the van and asked Yanders and Kendrick to get out. The agents verified that Kendrick was the owner of the vehicle, and obtained her consent to a search.

In the course of executing the search, the agents found two white boxes marked "J.T. Baker," recognized by one of the agents to be the name of a chemical manufacturer. The boxes emitted a "strong smell of chemicals." The agents spoke with both Yanders and Kendrick, and ultimately asked Yanders if he would "assist . . . in [the] investigation at that point, and continue with the delivery of the chemicals." Yanders agreed. The agents then formulated a plan for carrying out the controlled delivery. Pursuant to the plan, the agents followed Yanders and Kendrick to their residence, located at 55 Reed Street in Buffalo.

At the residence, Yanders permitted an agent to attach a tape recorder to the telephone in order to monitor conversations with Macklin. The agent instructed Yanders to try to get Macklin to agree that Yanders would deliver the boxes to Macklin that night. Yanders then phoned Macklin three times at Macklin's home telephone number. During the third conversation, Macklin agreed to have Yanders bring the boxes in the van to Macklin's house. By then it was approximately 3:00 a.m.

Yanders then drove the van to Macklin's residence at 520 Broadway, and knocked at the door. Macklin answered. After speaking briefly, the two men went to the van, retrieved the two white boxes, and placed them in the trunk of Macklin's car, a white Buick automobile parked nearby. Macklin went back inside 520 Broadway, and Yanders drove the van back to 55 Reed Street.

Several hours later, at approximately 7:00 a.m., Macklin came out of 520 Broadway and got into the Buick, which the agents had been surveilling. He then drove to 62 Fox Street in Buffalo, the residence of Swain, parked, and walked to the back of the building. Five to ten minutes later, Macklin returned to the car and drove to a restaurant. He stayed at the restaurant only a short time, then returned to 62 Fox Street and backed into the driveway.

Some time later, Macklin, accompanied by Swain, drove the Buick from 62 Fox Street to 880 Broadway, and went into the building at the latter address. When they emerged shortly thereafter, Swain was carrying a box. Swain and Macklin placed the box in the trunk, then drove back to 62 Fox Street. Macklin again backed into the driveway, the trunk of the Buick was opened, and one of the two men was observed by a surveilling Buffalo city detective carrying a box toward the rear of the house. Ten to fifteen minutes later, Macklin and Swain got back into the Buick, drove to 520 Broadway, and entered that building.

Within a few minutes, a man later identified as Dwayne King came out of 520 Broadway and drove the Buick to Fox Street. He parked near the intersection of Fox Street and Broadway, got out, and walked through several yards in a direction away from Fox Street. He returned approximately five minutes later carrying a green duffel bag, then drove up Fox Street to number 62.

Juanita Sebastian, who lived from time to time at 62 Fox Street with Swain, was standing in front of the house when King drove up. She flagged him down and asked him to give her a ride to work. King gave her the green bag, which she carried into the house and placed on the kitchen table. She returned to the car, and she and King began driving down Fox Street.

DEA agents then stopped the car and spoke with King and Sebastian. In response to questions concerning activity at

62 Fox Street, Sebastian confirmed that Macklin and Swain had carried some boxes into the house that morning. The agents told Sebastian that they believed those boxes contained dangerous chemicals to be used for the manufacture of drugs, and asked for her consent to search the house. She agreed, and let the agents into the house. Inside, Sebastian told the agents that she believed the boxes had been placed in the attic, which was the second floor of the house, and they proceeded to the attic.

The attic was a large, open room with several tables. It had a "very heavy chemical smell." There were four boxes on the floor, and a fifth sitting on one of the tables. Among these were the two white boxes that Yanders and Kendrick had transported from New York. On the tables and in the boxes, at least two of which were open, were containers of hydrochloric acid, bromobenzene, ether, ligrione, sodium bisulfite, sodium metabisulfite, sodium cyanide, and other chemicals. There was also in the attic a plastic bag holding various paraphernalia such as sifters, bowls, beakers, spoons, and a mask.

The agents found a large mason jar inside a bowl, in which there was also some white residue, in the kitchen of the house. They also found the green duffel bag there; it contained another mason jar and a scale.

While the agents were in the house, the telephone rang; apparently both Sebastian and King spoke with the caller. King told agents that the caller was Swain, and that Swain had instructed King to bring the Buick back to 520 Broadway. An agent got into the back of the Buick to accompany King, and other surveillance units followed in separate vehicles. When King arrived at 520 Broadway, Macklin and Swain emerged and were arrested. Both men were then driven back to 62 Fox Street, and then to the Buffalo office of the DEA. One agent sitting in a closed car with them noticed a "heavy chemical, ether-type smell in the vehicle ... coming from Mr. Swain and Mr. Macklin."

At the DEA office, Macklin and Swain were placed in a room in the cell area. Several days later, an agent found two pieces of paper in the same room; the paper "contained the names of chemicals and ... appeared to contain some type of formula for the manufacture of PCP." Macklin's fingerprint was found on one of the papers.

On May 4, 1988, a grand jury indicted Macklin and Swain for the offense of conspiracy to manufacture a substance containing PCP in violation of 21 U.S.C. § 846 (1988). After an eight-day trial before Judge Arcara and a jury, Macklin and Swain were convicted of the charged offense on January 31, 1989. The district court thereafter conducted a two-day sentencing hearing at which the government and defendants offered conflicting expert testimony from chemists on the issue of the quantity of PCP that the attic laboratory was capable of generating. At the conclusion of the hearing, the court stated that the government had "established by a preponderence [sic] of the evidence that the defendants could have produced pure PCP in an amount in excess of 300 grams."

A base offense level of 34 was assigned to each defendant. Macklin received an upward adjustment of two levels, for a final offense level of 36, based upon evidence at trial indicating Macklin was the organizer of the conspiracy. In accordance with his criminal history category of I, he was sentenced to 210 months imprisonment. Swain received a two-level downward adjustment for his minor role in the conspiracy, but this reduction was offset by a two-level upward adjustment for his attempt to obstruct justice by offering to send Sebastian on a paid vacation if she agreed not to appear before the grand jury. With a total offense level of 34 and a criminal history category of I, Swain was sentenced to 160 months imprisonment.

This appeal followed. Further factual matters will be set forth in our consideration of the particular issues to which they relate.

*Discussion*

Defendants advance several contentions on this appeal. Macklin argues that the

indictment gave insufficient notice of the charge because it "failed to set forth the exact quantity of the drug which [the government] proved that Macklin had conspired to possess." Swain contends: (1) that the evidence adduced at trial was insufficient to support his conviction; and (2) that the district court should have made findings of fact in the sentencing hearing pursuant to a higher standard than the preponderance of the evidence in determining the object of the uncompleted conspiracy with which Macklin and Swain were charged. Both defendants also contend that the district court's findings as to the quantity of pure PCP that could have been manufactured as a result of the conspiracy were clearly erroneous.

**A. Sufficiency of the Notice Provided by the Indictment.**

The sole count in the indictment states, in pertinent part, that Macklin and Swain conspired:

> to manufacture a substance containing phencyclidine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

Macklin argues that because the indictment fails to state an exact quantity of PCP, he was not properly apprised of the charge against him, and was thus deprived of a fair trial.

■ We find no indication in the record, however, that Macklin ever raised this contention prior to trial, as is required by Fed.R.Crim.P. 12(b)(2). *See United States v. Miller*, 246 F.2d 486, 488 (2d Cir.), *cert. denied*, 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261 (1957). Accordingly, the indictment must be deemed sufficient "unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." 1 C. Wright, Federal Practice and Procedure § 123 (2d ed. 1982), at 354–55.

The form of an indictment is governed by Fed.R.Crim.P. 7(c)(1), which provides, *inter alia*, that "[t]he indictment ... shall be a plain, concise and definite written state-

ment of the essential facts constituting the offense charged." We have held that to satisfy this rule, "[t]he facts alleged must be adequate to permit a defendant to plead former jeopardy upon prosecution. The indictment must also be sufficiently specific to enable the defendant to prepare a defense." *United States v. Carrier*, 672 F.2d 300, 303 (2d Cir.) (citing 8 Moore's Federal Practice ¶ 7.04 (2d ed. 1981)), *cert. denied*, 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982); *see also* 1 C. Wright, Federal Practice and Procedure § 123 (2d ed. 1982), at 348 ("[I]t is ... essential that every element of an offense be stated and that the defendant be given fair notice of the charge against him, but [Rule 7(c)(1)] now permits a plain, concise, and definite statement of the essential facts constituting the offense." (footnote omitted)).

■ These principles apply, of course, in the context of conspiracies charged under 21 U.S.C. § 846 (1988). *See United States v. Bermudez*, 526 F.2d 89, 94 (2d Cir.1975), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). An indictment under that statute need only allege the existence of a narcotics conspiracy, a relevant time frame, and the statute alleged to be violated. *Id.; see also United States v. Roman*, 728 F.2d 846, 852 (7th Cir.) (quoting *United States v. Sweeney*, 688 F.2d 1131, 1140 (7th Cir.1982) (quoting *Bermudez*, 526 F.2d at 94)), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984).

■ Clearly, both the letter and spirit of Rule 7 were satisfied by the rather routine indictment in this case. While Macklin apparently argues that the enactment of the Sentencing Guidelines somehow effected a substantive change in what is required for a section 846 indictment, the only authority to which he directs our attention is *United States v. Moreno*, 710 F.Supp. 1136 (E.D. Mich.1989), *aff'd as to convictions and remanded for resentencing*, 899 F.2d 465 (6th Cir.1990), a case that dealt with a Sentencing Guidelines issue, rather than the sufficiency of an indictment, and was reversed as to that issue by the Sixth Circuit.

Macklin claims that he was unaware of the extent of possible exposure at his eventual sentencing, yet fails to explain how that would inhibit his ability to defend himself at trial. We note in this connection that "[n]either section 841(a) nor section 846 requires any specific quantity for conviction." *United States v. McHugh*, 769 F.2d 860, 868 (1st Cir.1985). Macklin was charged with a scheme to manufacture PCP in the attic of a house; we think it obvious that his ability to defend this conspiracy charge was thoroughly unrestricted. Accordingly, we reject Macklin's contention as to the sufficiency of the indictment.

B. Sufficiency of the Evidence as to Swain.

■ A defendant who challenges the sufficiency of the evidence against him "bears a 'very heavy burden.'" *United States v. Chang An-Lo*, 851 F.2d 547, 553 (2d Cir.) (quoting *United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986)), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *see also United States v. Torres*, 901 F.2d 205, 216–17 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Rios*, 856 F.2d 493, 496 (2d Cir.1988) (per curiam). On review, "'pieces of evidence must be viewed not in isolation but in conjunction.'" *United States v. Brown*, 776 F.2d 397, 403 (2d Cir.1985) (quoting *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970)), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). Furthermore, the evidence must be viewed "in the light most favorable to the government," *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), and we "must credit every inference that could have been drawn in the government's favor." *United States v. Villegas*, 899 F.2d 1324, 1339 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990); *see also United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). In addition, the

government need not "preclude every reasonable hypothesis which is consistent with innocence." *Chang An-Lo*, 851 F.2d at 554 (citing *United States v. Fiore*, 821 F.2d 127, 128 (2d Cir.1987)). "If, from the evidence viewed in this light, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the conviction must be sustained.'" *Villegas*, 899 F.2d at 1339 (quoting *Chang An-Lo*, 851 F.2d at 554).

Where a conspiracy is alleged, the necessary elements "'may be established ... through circumstantial evidence.'" *United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983) (quoting *United States v. Sanzo*, 673 F.2d 64, 69 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982)). "However, 'absent evidence of purposeful behavior, mere presence at the scene of a crime, even when coupled with knowledge that a crime is being committed, is insufficient to establish membership in a conspiracy; and mere association with conspirators is similarly insufficient.'" *Chang An-Lo*, 851 F.2d at 554 (quoting *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985) (citations omitted)). Thus, to prove membership in a conspiracy, there must be "evidence of purposeful behavior designed to further" that conspiracy. *Id.; see also United States v. Torres*, 519 F.2d 723, 726 (2d Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975); *United States v. Johnson*, 513 F.2d 819, 823–24 (2d Cir.1975).

Swain argues forcefully that the evidence at trial showed only that he assisted Macklin in carrying boxes of chemicals into Swain's attic. Swain urges that even when viewed in the light most favorable to the government, the evidence introduced at trial provides no basis to infer that he had "any independent information about the nature or uses of these items." Accordingly, he contends, the evidence demonstrated no more than mere presence, and was therefore insufficient to support his conviction. In support of his contention, Swain lays particular emphasis upon our prior decisions in *United States v. Di Stefano*, 555 F.2d 1094 (2d Cir.1977), *Soto*, and *United*

*States v. Nusraty,* 867 F.2d 759 (2d Cir. 1989). These cases, however, are clearly distinguishable.

In *Di Stefano,* Ronald Blanda and Patrick Edwards, who intended to rob a bank together, decided to make a final check of the bank before carrying out their plan. While riding in a car with DiStefano, they asked the driver to stop at the bank in order for DiStefano to get change. Their actual intent, however, was to have DiStefano look for guards and camera locations. They did not say this, however, since they did not want the driver to know of their scheme. When DiStefano emerged from the bank, according to Edwards' testimony, she gave a nod to indicate that the coast was clear. DiStefano was convicted of bank robbery and conspiracy to rob a bank.

We reversed DiStefano's convictions for insufficiency of the evidence, reasoning that there was no evidence that either Edwards or Blanda informed her of their intent to rob the bank, especially in light of (1) the fact that the two men "deliberately did not discuss the robbery with [DiStefano] during their ride to the bank because of the presence of [the driver] in the car," 555 F.2d at 1103, and (2) the complete absence of evidence that DiStefano had any prior knowledge of the plan to rob the bank, *id.* at 1103 n. 8. On the crucial question of any communication to DiStefano of an instruction to case the bank, Edwards' testimony was: "I don't know exactly how we told her to do it. I don't remember. I'm trying to remember. I can't." *Id.* at 1098 n. 4.

In *Soto,* the defendant was living in a Bronx apartment that was being used as a narcotics "cutting mill." 716 F.2d at 990. When DEA agents raided the apartment and seized drugs and weapons, Soto was found asleep with her young child in the bedroom. She was arrested with several others and ultimately convicted on two counts of conspiracy. Because the evidence clearly established that the apartment was crucial to a narcotics distribution conspiracy, "[t]he most significant circumstance relied on by the government in sup-

port of the jury's finding of guilt [was] the fact that Soto lived in [the] apartment ... for three weeks prior to her arrest." *Id.* at 991.

We reversed the conviction, stating:

While it would not be accurate to characterize Soto's presence at the apartment as merely transitory, we nevertheless consider the total circumstances of how Soto came to reside there to be highly significant. For here we have an individual newly arrived from Puerto Rico, accompanied by a child of tender years, clearly in need of shelter. To this end, as soon as she arrived in New York defendant took up residence at the 2526 Bronx Park East apartment. Although the living arrangements there may not have been ideal, there is no indication that defendant had any other alternative.

\*   \*   \*   \*   \*   \*

Here, ... there is no ... showing or even the slightest suggestion that Soto had knowledge of the ongoing drug mill activities before moving into the Bronx apartment. Moreover, considering the absence of her name from the list maintained by [the organizer of the conspiracy] of persons he employed in the furtherance of the drug operation, the inescapable inference to be drawn from the evidence is that she never joined the conspiracy.

716 F.2d at 991–92.

In *Nusraty,* one Robert Detrich was arrested at John F. Kennedy International Airport in New York after Customs officials discovered packets of heroin hidden in a new suit Detrich had brought with him from India. Detrich told DEA agents that he carried the suit in his luggage as a favor to Nusraty's brother, who had asked Detrich to deliver the suit to Nusraty in the United States. Detrich claimed that he had no knowledge of the heroin. He told agents that he expected Nusraty to meet him outside Customs, and agreed to make a controlled delivery to Nusraty under DEA surveillance.

As Detrich had anticipated, Nusraty was at the airport. Detrich's attempt to effectuate the controlled delivery failed, how-

ever, when Nusraty declined to accept the suit and denied Detrich's suggestion that Nusraty's brother had told Nusraty that the suit would be arriving. When Nusraty began to walk away from Detrich, both were arrested.

Nusraty's position prior to and during his trial was that he was present at the airport in connection with his job as a cab driver, and that his encounter with Detrich, whom he had met previously, was pure happenstance. The jury evidently declined to believe this testimony, and convicted Nusraty of conspiring to possess heroin with intent to distribute it, importing heroin, or aiding and abetting importation, and possessing heroin with intent to distribute it, or aiding and abetting such possession. On appeal, we reversed on all counts, stating:

> Even accepting the government's argument that Nusraty was waiting for Detrich at the airport, that single circumstance and the context in which it occurred are not sufficient evidence to show Nusraty's knowing involvement in the conspiracy charged. Simply waiting for someone at an airport, even under such suspicious circumstances as exist here, is not, by itself, an act from which knowing guilty involvement can reasonably be inferred.

867 F.2d at 764. Noting that Nusraty's conviction "rest[ed] principally on his presence at the airport, and on his association with his uncle, his brother, and Detrich, some or all of whom may have been links in a chain of narcotics distribution," we concluded that "the circumstantial evidence here was simply too thin to warrant an inference of guilty knowledge on the part of Nusraty." *Id.*

We do not regard these precedents as governing decision here. The proven relationship of the defendants to the alleged criminal conduct was tenuous and fleeting in both *Di Stefano* and *Nusraty*. The *Soto* defendant was merely present at a site of narcotics activity, had a thoroughly plausible explanation for her presence, and was not included in a list of operatives maintained by the ringleader of the narcotics operation.

Here, by contrast, the chemicals needed to manufacture PCP, which emitted a distinctive and considerable odor, were assembled in the attic of Swain's residence. There was no apparent use for this combination of assembled chemicals other than the manufacture of PCP. Further, the jury was clearly entitled to conclude that Swain played an active personal role in that assembly. Such a conclusion could be derived not only from the surveillance observations of the DEA agents, but also from the testimony of Sebastian, who shared the residence at 62 Fox Street with Swain and testified that Swain and Macklin carried the boxes of chemicals to the attic at 62 Fox Street the morning of April 22, 1988. In addition to this being Swain's permanent residence, rather than a temporary abode as in *Soto*, any contention that Swain engaged in an innocent storage of the chemicals for Macklin is undermined by the subsequent delivery that morning to 62 Fox Street by Dwayne King of a green bag containing various paraphernalia useful for the manufacture of PCP from the chemicals previously assembled. Further, one of the DEA agents who arrested Swain testified that Swain smelled of chemicals in the car that transported him to the DEA office after his arrest.

In addition, Sebastian testified that after she was served with a subpoena to appear before the grand jury investigating this matter, Swain attempted to rekindle their relationship and dissuade her from testifying. According to Sebastian, Swain promised her that if she did not testify "he would give me a paid vacation anywhere I want to go." Sebastian rejected both of his suggestions, the two then began to argue, and a physical altercation ensued.

As Swain correctly contends, and as the district court carefully instructed the jury when Sebastian gave this testimony, this evidence was admissible not as direct proof of Swain's guilt, but rather of consciousness of guilt on his part. *See United States v. Scheibel*, 870 F.2d 818, 822 (2d Cir.1989); *Di Stefano*, 555 F.2d at 1104. So considered, and taken in conjunction with the other evidence against Swain, we

conclude that there was sufficient evidence to sustain his conviction.

## C. Findings of the District Court at the Sentencing Hearing.

As indicated earlier, Swain contends that the district court should have applied a higher standard of proof than the preponderance of the evidence in determining the object of the uncompleted conspiracy with which Swain and Macklin were charged. Swain also claims that the district court erroneously concluded that over 300 grams of "pure" PCP could have been made with the chemicals found in Swain's attic, because the uncontradicted evidence was that any PCP produced therefrom would have contained impurities. Macklin similarly sees clear error in the district court's sentencing findings because the district court accepted the conclusions of a government expert witness premised upon the labels attached to bottles of chemicals found in Swain's attic, rather than upon laboratory analysis of those chemicals. We turn to these contentions.

### 1. *Burden of Proof at Sentencing Hearing.*

■ In *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990), we ruled that the preponderance standard should be applied to determine "relevant conduct" under section 1B1.3 of the Sentencing Guidelines. We have since followed *Guerra* in applying this standard in other "relevant conduct" cases, *see United States v. Santiago*, 906 F.2d 867, 871 (2d Cir.1990); *United States v. Schaper*, 903 F.2d 891, 898–99 (2d Cir.1990), as well as in a myriad of other situations. *See, e.g., United States v. Uccio*, 917 F.2d 80, 85 (2d Cir.1990) (stating general rule); *United States v. Nichols*, 912 F.2d 598, 603 (2d Cir.1990) (factual basis for upward departure); *United States v. Tillem*, 906 F.2d 814, 829 (2d Cir.1990) (amount of extortion); *United States v. Copeland*, 902 F.2d 1046, 1049 (2d Cir.1990) (service as a "steerer" in narcotics transaction); *United States v. Jones*, 900 F.2d 512, 521 (2d Cir.) (substantial interference with administration of justice), *cert. denied,* — U.S. —, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990); *United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 182 (2d Cir.) (enhancement of base offense level for possession of firearm), *cert. denied,* — U.S. —, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Shoulberg*, 895 F.2d 882, 886 (2d Cir.1990) (attempt to obstruct justice); *United States v. Rivalta*, 892 F.2d 223, 230 (2d Cir.1989) (resultant death justifying upward departure); *United States v. Candito*, 892 F.2d 182, 186–87 (2d Cir.1989) (participation in narcotics conspiracy).

Swain points, however, to a recent amendment to the Guidelines which applies the higher standard of reasonable doubt to a special class of conspiracy cases. Under U.S.S.G. § 1B1.2(d), "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." An application note to that section states in pertinent part:

> Particular care must be taken in applying subsection (d) because there are cases in which the jury's verdict does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.

U.S.S.G. § 1B1.2, comment (n. 5).

As the Sentencing Commission made clear in promulgating this application note, however, it was required because: "A higher standard of proof should govern the creation of what is, in effect, a new count of conviction for the purposes of Chapter Three, Part D (Multiple Counts)." U.S.S.G. App.C. ¶ 75, at C. 36. No such situation is presented here, and we accordingly see no reason to depart from the rule established in *Guerra* and consistently followed thereafter in this circuit.

## 2. *The Sentencing Findings.*

■ After a probation officer prepared a presentence investigation report pursuant to Fed.R.Crim.P. 32(c)(1), the district court held a sentencing hearing, *see* U.S.S.G. § 6A1.3, on April 12 and 18, 1989. The central issue at the hearing was the determination of the base offense level applicable to each defendant under U.S.S.G. § 2D1.4, which provides:

> Base Offense Level: If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed.

Since the chemicals were seized from Swain's attic prior to any effort to manufacture PCP from them, no drugs were available for purposes of calculation under the Guidelines. Section 2D1.4 was, however, intended to address such circumstances, as illustrated by Application Note 2 thereunder, which states:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the *size or capability of any laboratory involved.*

U.S.S.G. § 2D1.4, comment (n. 2) (emphasis added); *see United States v. Smallwood,* 920 F.2d 1231, 1236 (5th Cir.1991) (applying this guideline to determine pertinent drug quantity from "quantity of actual methamphetamine seized plus the practical yield of methamphetamine that could be derived in [defendant's] laboratory from the phenylatic acid seized at [defendant's] residence," although laboratory inoperative at time of seizure.)

The presentence investigation report recommended a base offense level of 34 pursuant to the Drug Quantity Table set forth in U.S.S.G. § 2D1.1(c)(5), which specifies that level for "[a]t least 3 KG but less than 10KG of PCP, or at least 300 G but less than 1KG of Pure PCP."

At the subsequent hearing, defendants and the government presented opposing expert testimony on the question of the laboratory's capability. The government's expert testified concerning the "bucket" method of PCP manufacture in clandestine laboratories, and expressed the view that based on the chemicals available to defendants, as well as the formula they apparently intended to use, by a "conservative computation they would have produced at least 550 grams of pure PCP." As to the chemicals themselves, the expert testified that while she had personally seen all of the chemical containers seized from Swain's attic, she did not test the substances in every container. Instead, she noted the physical characteristics of the substances, and believed the observed characteristics to be consistent with the labels on the respective containers, many of which she observed to be factory sealed. She considered the chemicals dangerous and ordered them destroyed.

The defense expert testified, in the words of the district court, that:

> defendants would not have been able to produce PCP without proper laboratory conditions which they did not have at the house on Fox Street where the ingredients were found. He also found the formula was incomprehensible, and without testing each ingredient, he could not testify to an absolute certainty that each container had the ingredient consistent with its label and had not been altered.

At the conclusion of the sentencing hearing, the district court found that "the government has established by a preponderence [sic] of the evidence that the defendants could have produced pure PCP in an amount in excess of 300 grams."

Macklin and Swain both contend, albeit for different reasons, that this finding cannot be sustained. Macklin urges that no reasonable scientist would "rely upon labels attached to bottles which are found outside a scientific laboratory, as a matter of scientific method, without an analysis of the contents of the bottles[.]" Swain con-

tends that the government expert's testimony at the sentencing hearing as to the purity of the PCP that could have been manufactured conflicted with her testimony at trial; as a result, Swain urges, the expert's "testimony taken as a whole provided no basis whatsoever for the trial court's conclusion that the 800 grams of PCP produced would have been pure." In light of the defense expert's testimony at trial and at the sentencing hearing emphasizing the difficulty of the purification process, Swain argues that "[t]he only proper conclusion from this record is that either 800 grams of impure PCP or 78 grams of pure PCP would have been produced." The base offense level under section 2D1.-1(c) in either such event, he correctly concludes, would be 30 rather than 34. Swain also argues that the district court erroneously believed that the question whether the PCP was pure or impure "made no difference."

In reviewing a sentence, we must "accept the findings of fact of the district court unless they are clearly erroneous." 18 U.S.C. § 3742(e) (1988). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

As to the failure to subject all of the chemicals to laboratory analysis, the district court stated:

> I have ... considered the concerns raised by the defendants that the drugs were not tested and were destroyed prior to trial. While it may have been preferable to retain the chemicals and test them, [the government expert] testified that she ordered them destroyed because they were dangerous. Under the totality of the circumstances, where the chemicals were found, their condition, and the inspection by [the government expert], I believe that the government has proven by a preponderence [sic] of the evidence that they were necessary ingredients for the manufacture of PCP. It was not unreasonable, given the type of chemi-

cals, for an experienced chemist to order these chemicals destroyed.

We regard these findings as thoroughly reasonable, especially in view of the government expert's testimony that: (1) the contents of a bottle whose label had been removed were subjected to laboratory analysis and found to be piperidine, an ingredient in PCP; and (2) she carefully examined the containers of chemicals (with which she was familiar), many of which were factory sealed, and they appeared to correspond to their labels. *Cf. United States v. Pirre*, 927 F.2d 694, 697 (2d Cir. 1991) (permissible for government to estimate weight of seized cocaine, and destroy portion because of lack of storage space, so long as estimate "is grounded in fact and is carried out in a manner consistent with accepted standards of reliability").

■ We find a similar absence of clear error in the district court's finding that the laboratory as stocked was capable of producing 800 grams of pure PCP. This finding was based upon the court's evaluation of competing expert testimony, a dispute that was resolved in favor of the government's chemist. While Swain asserts that the testimony of the government's chemist that 800 grams of pure PCP could have been produced "directly contradicted her testimony at trial," he directs us to no portion of the trial testimony in which the expert states the contrary. The most he can point to is the expert's trial testimony that for clandestine PCP laboratories, "it's common for them not to use a purification process."

At the sentencing hearing, however, where the focus on "pure" PCP first came into play because of the distinction made in the Sentencing Guidelines, the government's expert testified as follows:

> What is pure PCP?

> To my knowledge, it's PCP without any adulterants, that hasn't been cut yet.

> By cut, what do you mean?

> Adding another substance to it, adding a sugar to it to gain weight.

This interpretation is supported by the table set forth at section 2D1.1(c) whose interpretation is at issue, for the comment at the foot of that table states, *inter alia:*

Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance. If a mixture or substance contains more than one controlled substance, the weight of the entire mixture or substance is assigned to the controlled substance that results in the greater offense level. *In the case of a mixture or substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance or the offense level determined by the weight of the pure PCP or methamphetamine, whichever is greater.*

Emphasis added.

It thus appears that "pure" PCP, within the meaning of the Guidelines, is PCP which has not been "cut" or adulterated, rather than PCP which has been subjected to the maximum possible purification in terms of sophisticated laboratory procedures. We accordingly discern no error in the ruling of the district court on this issue.

### Conclusion

We have considered all of the claims advanced by Macklin and Swain, including those raised in Macklin's *"pro se* supplemental brief," and find them to be without merit. Accordingly, the judgments of conviction are affirmed.